Good morning. My name is John Rhodes. I'm from the Missoula Office of the Federal Defenders of Montana. I represent Mr. Benny Huang in this matter. Mr. Huang deserves a new trial principally for two reasons. First, because of the abuse of the open door rule. And second, because in making evidentiary rulings on relevancy, the district court based its decision on the government's case alone without considering Mr. Huang's right to present a defense. There are many other errors, but those are the two principal errors. I'm sorry. The last one again? When the district court considered evidence that we wanted to introduce, it rejected it based on relevancy, based on the shadoo and shoker.  Thank you. The district court said it was irrelevant because it wasn't part of the government's case disregarding Mr. Huang's right to present his case. I want to start with the open door issue because I think that's the most nuanced. Generally, the open door rule permits or applies in a situation where evidence is introduced by one party that unfairly prejudices the other party. And because of the unfair prejudice, the opposing party who suffered the prejudice is given the opportunity to negate or neutralize that prejudice. In this situation, what happened was a witness for the government, Agent Gahan, who is a narcotics agent up in British Columbia and who is an expert in the B.C. who is not only an expert on the B.C. bud industry generally, but also the expert in this case. This was a drug conspiracy that operated out of warehouses in the greater Vancouver area, and Mr. Gahan, Agent Gahan, was one of the principal surveillors and agents investigating this conspiracy. And what happened was when I was cross-examining him, I was trying to do standard cross-examination technique and say, these are all the facts you have that somehow indicate Mr. Wong is knowingly involved. And what Mr. Gahan came back was with a testimony that somehow there was a comfort level between Mr. Wong and the other co-conspirators, alleged co-conspirators, and therefore that comfort level indicated that he was guilty. Kagan. Mr. Rose, the one of the – in effect, he volunteered a lie that wasn't directly responsive to your question, in effect. There wasn't any objection interposed for the purpose of moving to strike, any of that stuff, on any ground. At one point, when the government then on redirect started to inquire what was meant by comfort level, you objected, but on the ground of ask and answer, which, as we all pretty much know, is never going to get you anywhere. And it was only later, and still without a motion to strike, that you suggested or the counsel suggested, I don't know if you tried it, suggested that it was an inappropriate expression. Well, what happened was, is I remember standing there and thinking this isn't the question that I asked. And I thought about moving to strike, and I know the court, from both being on the bench at the district court level and trying cases in their lawyer capacity, knows trial techniques. And I thought, should I ask the court to move to strike this, and that's sort of asking the court to unring the bell, put the toothpaste back in the tube, and highlighting to the jury, this is important. I'm with you. I mean, I understand that. But the toothpaste is out. So once the toothpaste is out, it's out. And so, assuming that the statement was wrong, why wasn't the door open? Well, because the government took it a step further, and it elicited testimony from the expert in this case, both generally in the B.C. Budd industry and the specific facts of this case. The government elicited testimony about Mr. Wong's mens rea. And the government's conceded that that was inadmissible evidence, ordinarily under federal rule of evidence 704, subpart B. And what the government's saying is, we somehow opened the door. And that's where the intricacies of the open-the-door rule govern. The open-the-door policy applies to somehow negate an unfair prejudice gained by the other party. Here, what the government did is it ---- Where does that come from? I mean, I guess I simplistically thought of it as being simply, if you pursue a line of inquiry or examination comes out that is beyond whatever the scope or this or that, then the door is open to pursue it and to clarify. Yes, but you can't clarify error that benefits you by compounding it with further error that is expressly prohibited by the rules of evidence, and the government's conceded otherwise would be inadmissible. And you can look at the Seventh Circuit has a good case about ---- it's called Martinez, and we cited it in our briefs. And basically, it says that the open-the-door rule cannot be subverted into a rule of the injection of further prejudice. And that's what's happened here, is the government benefited from the prejudice and the nonresponsive answer, and then it got further benefit under the abuse of the open-the-door rule. Well, I don't think you have to go outside our circuit. Doesn't Beltran say we have previously allowed the government to introduce otherwise excludable testimony when the defendant opens the door by introducing potentially misleading testimony? Yes, and that's another basis where the open-the-door rule applies is to help the party that was prejudiced. And here, we were the party that was prejudiced both times. But if somehow we had gained a benefit by misleading the jury, that's another situation where the opposing party can clarify the misimpression that we created. Here, we didn't create a misimpression. And this circuit's decision in Kesey, which we cited in our brief, is also instructive. There, the defense introduced evidence about whether the defendant, who is a Vietnam veteran, could form the requisite mental state to commit the crime. And once the defense introduced that issue and benefited from the evidence introduced, the court at the district court level and then this court said at the district court level that the defendant was prejudiced. And rebut's a key word. Here, the government didn't rebut the evidence. It just took it and enhanced it by introducing impermissible ultimate issue evidence. I'd like to hear your explanation for why the error is prejudicial. I recognize, of course, that the defendant's knowledge was the ballgame. But you do have set against that. I'm just going to say it's for the purpose of getting your response to it. But set against that, you do have unusually probative evidence for a courier case. I mean, Wong was inside the hub of the operation. He had switched trucks with another person in the enterprise. He was carrying $3 million worth of marijuana, which is raises a very strong inference of intimate involvement in the operation. So a lot of this stuff, you normally don't have in a courier case. So the question is, why isn't it harmless? Well, I've got a lot to say on that, starting with a few things that Your Honor said. First, you said he was inside the operations. We don't know what was in that warehouse when he was in there. It could have been completely empty other than the truck that had been backed in there. Could have been. That's all we know. Second, with respect to switching trucks and trailers, we don't know if he somehow physically switched trucks and trailers with Mr. Hirschberg. But at this point, you're interpreting, I mean, for purposes of the harmless error inquiry, we're construing the facts that favor the verdict. So I'm putting favorable spin on all the facts, which I think is perfectly appropriate for purposes of the harmless error inquiry. I would disagree with that, Your Honor. I think this case, this Court's recent decision in Gonzalez-Flores says that when there's error, it presumptively requires reversal. The burden is on the government to show that the error more likely than not did not affect the verdict. Oh, I don't quarrel with that. I'm just saying that the facts are taken in favor of the verdict for purposes of the harmless error inquiry. I mean, if you don't want to, you know, deal with my spin on it, don't. I'm inclined to agree with you. I'm just trying to get your best argument for why on my spin of the facts the error isn't harmless. I can speak specifically about the facts, and I have a lot more to say about that. On the facts, you need to look at what the government did in its closing argument. It took. I can't do it because I don't have it. Okay. It took Agent Gahan's testimony that it admitted was otherwise inadmissible and capitalized on it. It talked about Agent Gahan's surveillance of the warehouse, and it did that in ER 1485 through 1487. Did the government, more to the point, did the government in closing argument argue the statement, I would have known, I believe he would have known where the marijuana is? It made two comments that I think implicate Agent Gahan's impermissible prejudicial testimony. First, it argued that when my client was at the border being interrogated by the customs agent, he should have disclosed where the marijuana came from. He should have said, hey, I know that marijuana must have came from this warehouse. That was at ER 1527 and 1528. That dovetails. Just specifically, did the government say, look, you heard the case agent explain how these deals go down, and he said he believed that Huang knew where the marijuana came from? He did not say that. Okay. The prosecutor did not say it. The other thing he said was he told the jury, quote, you will have to determine what the defendant knew and how he was acting knowingly. That's at ER 1482. And that's exactly what Agent Gahan unlawfully testified to. So that's how the government took the Gahan's testimony and wove it into its closing argument. That's pretty obscure. I don't think it's obscure because Agent Gahan used the testimony. He used the word knew. And the government in closing argument used the word knew and said that was the decisive fact, which we all agree. That's the issue in the case, isn't it? Yeah. Oh, yeah, no doubt about it, which is why this testimony is so damning. There was no curative instruction offered. Well, what could cure it? An instruction to disregard that testimony. But you didn't ask for that. That's the problem. Yes, we did, Your Honor. You didn't ask to strike the testimony. We, when we made our objection, the Court overruled our testimony. This judge does not want argument in front of the jury. At the first jury recess, we requested a curative instruction. The Court denied it. He said it would be taken up in final jury. But what was the jury instruction that you requested? We were going to ask for one, and he said no, that was the end of the issue. What instruction did you ask for? We didn't provide one to the courts. We said we'd like to. Well, what's the district court supposed to do with that? Well, then on closing of the settlement of final jury instructions, Your Honor, we provided two specific ones that are in the record. Oh, yeah, but that's a different deal. You never asked the district court to strike this testimony? Ever? I objected as inadmissible, and the Court overruled it. I hear you, and that was overruled. But when you say you never got a limiting instruction, I interpret limiting instruction to mean something like you're supposed to take this evidence only for the limited purpose of X. I asked we asked for a curative instruction was the words that I used, and the judge said no. But how can you cure that error without striking it? That's what I don't get. Well, that could have been a curative instruction is to disregard that testimony. He asked the Court and he shut me up. That was one problem here is the judge kept shutting me up, wouldn't let me make the record. This Court's decision in Kerr and in Sintob talks about the benefit or not of curative instructions. And they say they're most beneficial. You didn't ask for a curative instruction. Yes, I did. Those words, I don't understand how you cure that error without striking it. That could be the curative instruction. But the Court said no and moved on to the next matter. Well, you know, I guess practice can be what practice is. But if you don't state the ground to a district judge, you can't expect a district judge to be pressing it. Well, you did object to an ultimate issue and you did say something to the jury. Overrule the objection. Right. Well, I think the Court said, well, the jury will assess the worth of the testimony and that will be part of the instructions, ladies and gentlemen. You'll make a decision about how to assess the testimony of any witness who appears  And that's what the judge told the jury on final instructions. And that's where this Court's decision incurs, instructive, because it says that general instructions to the jury to assess the worth of testimony isn't adequate to defeat harmful error. This is Judge Hatton. Yes. Did he, was his instructions to you all that you could not have at the time you said ultimate issue moved to strike? Would that have been impermissible? I don't believe that part would have been, Your Honor. What would have been impermissible is to argue, get into this sort of colloquially with the Court. I know that the Court would not tolerate that. Given the time, and I think it does tie in with Judge Reimer's harmless error issue, could you address the situ and the other person on your defense? Because I had similar questions there. Did Judge Hatton ever understand that you were proffering that testimony in order to establish that there was a pattern of using closer to the actual event drivers who actually didn't, or at least were found, I gather, in this other case, not to have known? Did he understand that was the relevancy? Because there's all this talk in the record that we have, at least that I have, talks about will I be able to, you offered to make a proffer, but I didn't see any proffer, ultimately, that laid it out specifically what the purpose of the testimony was. Yes, Your Honor. When, what happened was I tried to question several witnesses on that, and when I questioned Agent Gahan, who, again, I think is the undisputed expert in this case, I went through a series of questions, and as soon as I asked him, did they claim the ignorance or innocence, the government objected, and I didn't even get those words out of my mouth, and the court sustained it. And then I started asking to make a proffer, and the court wouldn't let me do that until already, until it said it's made up its mind and it wasn't going to let the evidence in. Then it let me make an after-the-fact proffer, and we brought up the fact that they, too, claimed to be unwitting couriers. Now, where is that in the record, that latter part? I couldn't find that. That is at. . . It doesn't mean it's not there. I just didn't find it. It's on trial transcript page 640 and 641. Mr. Rhodes, I have a good deal of difficulty understanding how it could conceivably be relevant what some other person in a different situation, different trots, claims. It's hearsay, completely unreliable. Anybody can claim or profess innocence for lack of knowledge, and that has no relevance whatsoever to the defendant and to his state of mind. Well, the government was able to introduce evidence about a driver in September of 2001, Sidhu and Shoker in March of 2002, Wong in May of 2002, that he confessed. And they argued in closing that the fact that he confessed somehow suggested that Mr. Wong knew what was going on. Plus, we were trying to. . . That's a big difference between a confession and a claim. Right. And we're just. . . I mean, for starters. And we were also trying to make the point that there was an evolving modus operandi. First they had knowing couriers, then unknowing. When I tried to get into the issue, they started shipping by railroad. The court said that was irrelevant because that occurred after Mr. Wong was stopped, and anything that happened after he was stopped was irrelevant. And that's our point. What about people that were stopped six weeks before him? And I was mistaken, Your Honor. My proffer, I did not mention the unknowing courier. I tried to do that through Agent Gahan, and that's when the evidence was objected to as irrelevant. And the court told me and made rulings on that, so I figured I'd better move on. I'd like to reserve the rest of my time. Thank you. Mr. Thagard. Good morning. My name is Joe Thagard. I'm an assistant United States attorney from the Great Falls office of the United States Attorney's Office in Montana. Like Mr. Rhodes, I'll confine myself to the first two issues. With respect to the Gahan testimony, I think it's important to view the context in which this was presented. The United States presented Mr. Gahan essentially as a fact witness on direct examination and asked him about in particular the surveillance of this warehouse, which was the hub of the marijuana exportation business in this case. On cross-examination, Mr. Rhodes essentially sought to treat Mr. Gahan as an expert, in particular as an expert in the B.C. Buds smuggling business and its methodologies. And it was in that context that he opened the door to the testimony at issue. I don't quite follow that. How does that open the door? How does that prejudice the government? Well, the government, I don't know that it was necessarily prejudiced, Your Honor, by the evidence or by the testimony that was given by Mr. Gahan. However, it was a subject that was opened up, and it was a subject which was certainly left in sort of a haze at the end of the cross-examination. It wasn't precisely clear what Officer Gahan was talking about when he was speaking about this comfort level. At least it wasn't clear to me. Well, that may be true, but I don't know what it had to do. I mean, basically, through the questioning, he got a chance to reinforce all of the factors that, from his surveillance, led him to constitute the evidence that was relevant to Mr. Huang's involvement. And he went through that list, and then he used his mental impression statement, that what he was observing, he opined that it indicated a comfort level. Now, I don't know how, at the end of that testimony, the government was prejudiced at all. If anything, it was benefited, it seems to me, because the question opened up the opportunity for Gahan to go ahead and put together all the things. In fact, he says at the end, well, you asked me if I was aware of anything else, and that's the only thing I can think of. That was on the registration point. But he's gone through this laundry list. So I don't understand under, at least in the context of criminal cases, of opening the door vis-a-vis the government. The Beltran case and others say that, yeah, if he's left a misleading impression that's prejudicial somehow to the government, but it seems, if anything, all he did was sneak in a volunteered statement about comfort level, and then you got a chance to take that one and say, okay, now what do you mean by comfort level? And he testifies to something that clearly would otherwise be inadmissible. Well, and I understand the Court's concern there. However, immediately before the question was asked about their surveillance, Mr. Rhodes made the very general question of, so that's all the Canadian investigation has, just what you summarized to Gahan. And it was in that context that Gahan gave this testimony about comfort level. And so I think what happened was, at least it was my perception at the time, that there was this effort by the defense to portray that there was a very limited amount of evidence concerning Wong and his involvement when, in fact, there was substantially more. And when Gahan made this statement about comfort level, I didn't feel that it adequately addressed what his concern was. I don't know what the concern is. Comfort level is his mental impression that he is deriving from his observations. That's something that he wouldn't be allowed to testify to unless directly, I suppose, asked by the defense counsel. Did you form an opinion based on your observations as to whether Mr. Wong was acting with knowledge or whatever? I mean, he didn't open it up that way at all. Well, and obviously it's going to be up to the Court to make that determination. Okay. Well, I take your point. I'm just confused about why that uncertainty would somehow justify elaborating on it on redirect. Well, I guess the only way I can explain it, Judge, my perception at the time, and of course, fortunately, things are always clearer in retrospect than they are I wasn't accusing you of bad faith, believe me. I was just, I'm just looking at what happened. Well, thank you. I appreciate that, Your Honor. I'm not suggesting that. Well, you concede, do you not, that the questions that were asked on cross-examination that you say opened the door were not directly responded to? I do agree with that, Your Honor. And so if the door was open, that's your theory here, that the door was open. It wasn't opened by the questions. Am I right? The question was no one has ever said anything about Mr. Wang being involved. Is that correct? That gets you a yes or no, and if it's yes, it's an elaboration a little bit. And then the other one is, what is the other one? The other one is that that's all the Canadian investigation amounted to, or words to that effect, right? Well, no. The answers went a little bit beyond the question. I would agree with that, Your Honor. The defendant didn't object or move to strike any of those. That's correct, Your Honor. Then on redirect, you take the ball and kind of run with it, and then this guy gets expansive with you. That's correct, Your Honor. And this witness was somehow allowed to take control of what he was going to say without regard to what was being asked. Judge, I ---- And if there's any fault in retrospect from the lawyer's standpoint, it's if you didn't draw this witness up short. Judge, I would agree that the questions that were posed to this witness by both me and by the defense could have been crafted considerably better. Well, or they could have been answered more directly. That's true, Your Honor. Okay. However, I would also note that I think it's critical that when Mr. Gahan made his initial response, and it was to whatever extent it was beyond the scope of the question, Mr. Rhodes did not object that it was nonresponsive. And when the question was asked of Mr. Gahan on redirect examination, Mr. Rhodes objected that it was asked and answered, which I think, as we all know, is an objection that, as far as I know, has never been sustained. But he did not reject that it was nonresponsive. And so those, you know, legal theories about the inadmissibility of this evidence weren't presented to the district court. Now, with respect to this issue, I would also note that there also is, and we do not concede error here, but that to the extent that there was, this is a harmless error case. And this is a case which is not your run-of-the-mill courier case. The problem, of course, is that the testimony couldn't possibly have gone more directly to the only issue at the trial. And that's correct, Your Honor. However, I think that there was really very overwhelming evidence with respect to that state of knowledge, much more so than the normal courier case. And I think that the starting point with that is, first of all, is Mr. Wong's presence at this warehouse. And to the extent that there may have been error on the redirect examination, certainly if one looks at Mr. Gahan's testimony concerning a comfort level, even viewed in isolation and viewed outside the context of the redirect examination, that's very powerful testimony. And that is in the record, and it was put in the record during the course of his cross-examination. Additionally, Mr. Wong was driving this trailer truck, which was registered to Mr. Oostenbrink. Mr. Oostenbrink was pulling a similar trailer with essentially an identical compartment, loaded with marijuana and ecstasy, and that was registered to Mr. Wong. Now, at trial, the defense spent a great deal of time trying to suggest that maybe Mr. Wong didn't realize that he was the registered owner of this trailer pulled by Oostenbrink. But the fact of the matter is, at excerpts of the record, pages 1437 to 1439, it's confirmed that, in fact, when the registration for the trailer, for Wong's trailer that was found in Oostenbrink's possession was made, that an Ontario driver's license was shown. I think it was demonstrated very clearly to the jury that, in fact, Mr. Wong was much more than your normal mule, which one sees in these sort of cases. He was one of fewer than ten people who appeared at that warehouse. It was a very tightly controlled situation. And he did appear to be on very intimate terms with the people who were there, including the high-fives. Did you segue over then to these two other truck drivers that you did put in evidence of the ones that were supportive of your case but kept out the ones that defense counsel argues would have shown that not all truck drivers were alike and, indeed, some were supposedly innocent truck drivers? What's the status of that? Yes. Perhaps I could start, Your Honor, with the two truck drivers who we spoke about in our case, who Mr. Rhodes feels may have opened up the door. So to speak to the presentation of the testimony in his case. The two in our case were, one was a man named Finley. And Finley related to Wong because Finley, in October of 2001, was arrested smuggling marijuana into the Blaine Port of Entry. And he attempted to make a delivery to this Sotha Kong. Sotha Kong is later seen at the warehouse with Wong. Finley admits that he knowingly smuggled his marijuana in, and then on a prior occasion he brought marijuana in with an individual named Gord. It's later shown that Gord is Gordon Oostenbrink. And Gordon Oostenbrink is one of Wong's charged co-conspirators in this matter. So there's a link between Wong and Gordon Oostenbrink in this case. There's no such link between Wong and the two couriers who Mr. Rhodes attempted to introduce the evidence about, Sedu and Shoker. The second individual is Jaswinder Dhillon. And he was apprehended at the Port of Blaine again in, I believe, January of 2002, pulling a trailer loaded with marijuana. The relevance and the connection to Wong there is that the tractor trailer that Dhillon was using was actually released after the seizure, and it was the same trailer or tractor which Wong was driving on the day of his arrest at the Port of Sweetgrass. So that's the connection between Wong and those two individuals. There is not a connection, or at least there wasn't demonstrated connection between Wong and these other two individuals. But now let me just get to this. One of these counts was a conspiracy. Yes, Your Honor. And this defendant was convicted of a conspiracy. Yes, Your Honor. Not with a driver, right? With a driver. Which driver, Your Honor? With the conspirator. Was the co-conspirator another driver? Well, the conspiracy count read Oostenbrink, who was another driver, in Canada. And was not that person also kind of a principal in these various businesses? No, Oostenbrink was not. That would have been Sotha Kong, Your Honor. And so none of the co-conspirators then were in the hierarchy of these businesses? Well, yes. Sotha Kong, it is alleged, was. And, of course, Galaxy was also indicted, Your Honor. Oh, yeah. Galaxy was the trucking company. Now, these three, there was what, three trucking companies? Yes, Your Honor. And they're all in kind of the same place? That's correct, Your Honor. And your theory of this case is that they were all doing a whole bunch of stuff that was illegal, and they were doing it together, in addition to whatever they might have been doing legitimately? That's correct, Your Honor. Now, you got into evidence then what happened on these other occasions with these other drivers, all driving for one or more of these companies? That's correct, Your Honor. And then you say it's irrelevant that one or more of the drivers, driving for this same illegal group of companies, including the co-conspirator in this indictment, that that's irrelevant as to what happened there? Well, Your Honor, I think, and I would refer to the Court to Gahan's testimony on this point, because I think it's important to look at the scope of the government's objection and what was actually allowed in there. But it was a hearsay. It was. With Gahan, we actually made an objection on relevance. Okay. And with Gahan, we objected to only one question about this outfit, and that had to do with whether or not these two defendants over in Washington confessed to knowing about the source of the marijuana. Through Gahan, the rest of the testimony about that seizure came in. And I can point it out. Now, what I'm getting at is, isn't it if these companies, functioning wherever they were in Canada, are having all these truck drivers and they're all going out here and they're delivering marijuana into the United States, isn't it relevant to somebody's contention that I was a dupe? I've hired out here as a truck driver to do what I thought was legal because some of what they're doing is legal. Isn't it relevant as to what the co-conspirators and all of the people entwined with them are doing with some drivers who may be guilty and some who may be innocent and we have to pick and choose or determine which are innocent? Well, not necessarily, Your Honor. And there are two components to that. One is I think that Mr. Wong occupied a different sort of status in the smuggling operation than some of the other very, very low-level couriers, and I've talked about the reasons why. And that's one reason. The other reason, as I've said, is the only thing that we objected to in Gahan's testimony had to do with whether or not these people admitted that they knew the source of the marijuana. And our position on that was that those individuals, what those individuals actually knew wasn't relevant to what Mr. Wong knew because Mr. Wong had this different status. Well, they were allowed to go their way, were they not? Well, they were actually prosecuted. And found not guilty? Yes. And then some others were allowed to go their way? That was Oostenbrink, who was apprehended in Canada, Your Honor. Within Canada? Yes. Okay. But why isn't that relevant? Why isn't it? If you can put in sort of the – you can argue that Wong has this different status, but part of his defense is, A, he didn't, it's all circumstantial, and, B, it is not unknown for this company to entrust large amounts of marijuana, presumably in these hidden compartments, to some drivers who really didn't know or were the – A, they denied knowing, and if it could have been gotten into, the acquittals in those cases. So why wouldn't that weigh in the balance for the jury to say, you know, it's not 100%? What they got to see was your evidence that everybody that you chose to put in collateral to Mr. Wong was a guilty person somehow connected to him, but yet people driving for the same venture who arguably were innocent drivers, consistent with Wong's defense theory, that doesn't get under the theory of relevance. Well, and I think that's where we also segue over into Rule 403, Your Honor, and I think that we have to look at the fact that Finley actually confessed that he knew this was coming in. He actually made a confession to it. I mean, that's highly probative evidence, and I think it's highly relevant, whereas with these other two individuals, it's true that they were acquitted. We don't necessarily know why they were acquitted, and I think that it certainly would have been. Well, you didn't object on prejudice. I know that the judge sustained it. He at some point cited as a backup, my ruling will stand and I see no relevancy, and in any event, it's prejudicial under 403 without quite explaining why. Now, you're explaining why, but that wasn't the basis of your objection. Yeah, and all I can do is refer to the lower court's finding on that, that it wasn't present. But, you know, I mean, that's sort of the problem that we faced, and then if we look at the proffer that Mr. Rhodes made after Gahan's testimony, I believe it was during the testimony of the defense investigator they tried to put on, and we would submit that the testimony by both the defense investigator and Adrian Podacek were hearsay and were properly excluded on that ground. But that proffer really never got to the guts of what is being presented to this court, that it would somehow establish unwitting courier testimony. If you look at that proffer, it's just not within there. It talks about a similar modus operandi, you know, basically sort of a common scheme that's going on. That testimony all came in through Gahan, and we didn't object to it. I say I'm just about out of time. If the Court has any other questions, I'll entertain them. Otherwise, I'll sit down. Thank you. I think so. Mr. Rhodes. When we asked Agent Gahan if Sidhu and Shoker confessed, that's when the government objected on relevancy grounds. It couldn't object on hearsay grounds because it had agreed to let Agent Gahan testify to hearsay matters that were part of this entire investigation, because what happened is when my office went up to Canada, we discovered there was this 200-page-plus report over dealing with years and all these defendants and all these activities. It wasn't disclosed to us. Canadian officials told us that U.S. Customs had it, so we had to work with Mr. Thager to get it from Customs. We got the full report the morning the trial started, so as a remedy for that not giving us that. Are you saying that we're not operating under the usual hearsay rule here? For Agent Gahan, the government agreed that he could testify to hearsay matters in that report, and Sidhu and Shoker were in that report. And that agreement is in the record? Yes, it's at the very beginning of the trial, Your Honor. Okay. And so the hearsay rule is not something we should resort to here at all, nor should the trial court have? With respect to Agent Gahan's testimony, correct. And your question to him was? Did you know what Mr. Sidhu and Mr. Shoker, and then I rephrase it, did they confess that they knew about the marijuana and the government ejected on relevance grounds and the court sustained it? So it was purely a relevancy, has nothing to do with hearsay. That's ER-1281. Okay. With respect to the idea that it's okay to get evidence in about Finley because he's somehow closer in facts to Mr. Wong, one thing is if you look at ER-1484 in closing arguments, the government ---- I guess I just still have the same problem. I don't understand what not confessing has to do with what Wong knows. Because they were ---- there was an evolving MO here. First they used knowing couriers, which is what the government argued about Finley at ER-1484 in closing arguments. Then they resorted to unknowing couriers. And then later, because they were getting busted, too, they resorted to railroad transport. But he wasn't one of those people on the stand. And he was giving testimony under oath. And you say, did you know? And he says, no. That I can get my hands around if there's a link and if you establish all the foundation that he was part of the same operation at the same time and whatever. But I don't understand what the ---- what a claim that he didn't ---- what a statement he didn't confess means. It just means he didn't confess. The government got in that Mr. Finley confessed, so what's relevant? But he did confess. So what I'm saying is I don't understand what a statement that he didn't confess means. It goes to the reality that unknowing couriers are a fact of life. He doesn't know he's unknowing. He just shows he didn't confess. It shows it's possible, which is the standard of relevancy. Okay. If I can just quick, though, my time's up. So thank you. Thank you very much, counsel. We appreciate your argument. The matter just argued that will be submitted in the court. We'll stand in recess for the morning.
judges: Leavy, Rymer, Fisher